In the Matter of **WHITMAN CENTER, INC.**, a California corporation, Debtor.

No. 215903.

United States District Court
C. D. California.

May 28, 1968.

Joseph W. Fairfield, Beverly Hills, Cal., for petitioners Joe Massaglia, Jr. and Wilshire-Miramar, Inc.

Joseph S. Potts, Santa Ana, Cal., and Covey & Covey, Los Angeles, Cal., for debtor Whitman Center, Inc.

DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER DETERMINING INVALIDITY OF DEBTOR'S AGREEMENTS

HAUK, District Judge.

This matter came before the Court on May 27, 1968, upon hearing of (a) the report and recommendations, including Decision, Finding of Fact, Conclusions of Law and Proposed Judgment, made and submitted by the Special Master and filed May 6, 1968, pursuant to order of the Court dated March 14, 1968; (b) Debtor's Objections thereto and points and authorities in support of said Objections; and (c) Petitioner's points and authorities in response to Debtor's Objections.

Petitioners seasonably filed a Petition for Review seeking review of an order entered in the above proceedings on December 13, 1967, by the Honorable Norman W. Neukom, Referee in Bankruptcy. Petitioners contend that said Referee should have considered and determined the validity and legal effect of a certain agreement and amendment thereto entered into on January 14, 1967 between petitioner, Joe Massaglia, Jr., hereinafter for convenience referred to as "Massaglia", and Whitman Center, Inc., hereinafter for convenience referred to as "Debtor", and that his refusal to do so is the basis for their Petition for Review.

After preliminary hearings on said Petition for Review before the Court, upon stipulation of the parties by their respective attorneys then of record, the Court on March 14, 1968 ordered the entire matter referred to Allen J. Greenberg, Esq., Special Master, for consideration and determination of the issues of fact and law and directing that he submit his report and recommendations in the form of a decision, formal findings of fact, conclusions of law and a proposed judgment.

Evidence, both oral and documentary was presented to the Special Master for his consideration in four and one-half days of formal hearing. In addition, by stipulation of counsel made a matter of record, he informally examined the Honorable Norman W. Neukom, Referee in Bankruptcy, on April 10, 1968, with respect to the matter before the Special Master for his consideration. All memoranda of points and authorities heretofore submitted by counsel have been examined and studied and the matter is now ready for decision.

After full hearing, and upon considering Petitioners' Motion and Debtor's Objections together with argument thereon and all points and authorities submitted in support thereof, as well as those submitted in response thereto, the Court accepts and adopts the Special Master's report and recommendations including Decision, Findings of Fact and Conclusions of Law, which with appropriate but minor changes are now made by the Court hereinafter.

## DECISION

Before dealing directly with the relationship between Massaglia and Wilshire-Miramar, Inc. on one hand and Debtor on the other, which relationship began in November, 1966, it would be well to devote a little time to a statement of evidentiary facts which provide historical background.

In 1960, Debtor's predecessor in interest, B & W Productions Corporation, purchased some fifteen acres of land and leased under a 99-year lease from W. H. Girton and Ruth H. Girton some ten acres of adjacent land. The land owned in fee and the 99-year leasehold were transferred to Debtor in 1961. This is the very land with which we are now concerned. In June 1962, Debtor filed a Petition for Arrangement under Chapter XI of the Bankruptcy Act. Its sole assets were the self-same land. In December 1964, Debtor sold the land it owned in fee to Gulf Oil Corporation for $1,350,000 and immediately repurchased all but a corner lot of 150 ft. by 150 ft. for $1,220,000. The money received from Gulf Oil Corporation was used to pay off in full all creditors and the repurchase price of $1,220,000 paid to Gulf was in the form of cash in the sum of $220,000 and a note secured by a first deed of trust on 14.21 acres in the principal sum of $970,000 and bearing interest at the rate of 9.9% per year.

The transaction between Debtor and Gulf Oil Corporation alleviated Debtor's financial problems only for a brief period. The September 30, 1965 balance sheet of Debtor submitted to the Commissioner of Corporations of the State of California in connection with its application for a permit to issue stock, filed on November 2, 1965, shows cash on deposit with the Title Insurance and Trust Company of $17,954 and no quick assets. Its liabilities included accrued interest on the note and deed of trust to Gulf Oil Corporation from December 11, 1964 to September 30, 1965 in the sum of $73,691.09, rent payable to the Girtons on the leasehold from February 1, 1965 to September 30, 1965 in the sum of $16,000 and real property taxes owed in the sum of $10,637.50.

The evidence also showed that Debtor had no income either in the year 1965 or in the year 1966. Its liabilities on the Gulf Oil Corporation note and for rent continued to mount. On August 10, 1966, Debtor filed another Petition for an Arrangement under Chapter XI of the Bankruptcy Act and it has been and is now operating as a Debtor in Possession under the jurisdiction of the Court since that time. In the schedules filed by Debtor with the Court on August 22, 1966, it listed as its only realizable assets the land and leasehold with which we are concerned. It showed liabilities in the total sum of $1,261,693.66, of which $56,240.31 was owed to unsecured creditors, seven in number, and the balance to secured creditors. The liability to Gulf Oil Corporation on the note and deed of trust was shown as $1,043,691 and to the Girtons on the leasehold as $71,620.00. The balance owed to the three other secured creditors was listed at $33,902.95, of which a portion was disputed.

Debtor is a close family corporation. It was formed on April 13, 1961, but no permit for stock was issued until January 19, 1966. The issuance of 100 shares at $10 per share was then authorized and 50 shares were issued to Joseph C. Whitman and 50 shares to his wife, Cecele Whitman. Mr. Whitman is President and a Director. His wife, Cecele Whitman, and his son, Stuart Whitman, were listed as the other Directors as of November 2, 1965. The shares of stock were deposited in escrow with Merton L. Schwartz, Esq., then counsel for Debtor, and have been and are now in his possession as escrow holder, in accordance with the Order Approving Escrow Holder issued by the Commissioner of Corporations on January 19, 1966.

The land and leasehold are located at Harbor Boulevard and Chapman Avenue in the city of Anaheim not far from Disneyland and it was the purpose of

Debtor to develop the same as a trade center, to be known as "Whitman Center," with a number of major tenants, numerous satellite stores and high-rise structures, one a 20 story building for which plans and specifications had already been prepared. Debtor expected to finance the entire project with funds furnished by institutional lenders. All activity of Debtor was under the direct supervision and control of Joseph C. Whitman, its President, who made all pertinent decisions, received and disbursed whatever corporate funds came into his hands as he deemed best and, generally, ran the affairs of Debtor in the most informal manner.

Massaglia had been an owner and operator of hotel properties for many years, including the New Yorker Hotel in New York City and the Waikiki Biltmore in Honolulu. At one time he had an interest in twelve hotels. When he met Joseph C. Whitman in November 1966, his companies, Miramar Properties, Inc. and Wilshire-Miramar, Inc., in each of which he was the sole stockholder, owned and operated the Miramar Hotel in Santa Monica, California. Miramar Properties, Inc. has since been merged into Wilshire-Miramar, Inc. He also had a two-thirds ownership interest in the Franciscan Hotel, Albuquerque, New Mexico, which was leased to the Hilton Hotels.

We come now to a consideration of the circumstances which culminated in the execution on January 14, 1967, of the documents entitled "Joint Venture Agreement" and "Amendment to Joint Venture Agreement" by Debtor and Massaglia (Debtor's Exhibit No. 1).

The parties were brought together by one Phillip A. Younes, an agent of the Equitable Life Assurance Society of the United States. Younes had known Massaglia since 1953 and had known Joseph C. Whitman, hereinafter for convenience referred to as "Whitman," since 1962. Prior to getting in touch with Massaglia, Younes had tried to interest others in the Whitman Center. He had told Whitman about Massaglia in the spring of 1966 but did not get in touch with Massaglia until that fall. In the past he had discussions with Massaglia about methods of reducing the income tax he was required to pay and of investing whereby he would derive tax advantage. About the first of November 1966, he telephoned Massaglia from Whitman's office, introduced Whitman over the telephone to Massaglia, told him about Whitman Center and the general plan for its development and suggested this might be of interest to Massaglia. The latter asked to see a brochure or other material that might be available. In the next day or two Younes dropped by the Miramar Hotel in Santa Monica, California, and left with Miss Stone, Massaglia's secretary, the Appraisal Report of D. A. Armstrong and Emile H. Bernston (Debtor's Exhibit No. 12).

Within a few days thereafter a meeting was held in the Miramar Hotel at which Whitman, Younes and Massaglia were present. It lasted for at least two hours. Whitman detailed to Massaglia his plans for development of Whitman Center and showed him a number of leases which he had negotiated with prospective tenants for the Center, including signed leases with Thrifty Drug Company and with Van De Kamp Bakeries, a lease with Goodyear signed by Goodyear but not by Debtor and a proposed lease with Food Fair Markets. Whitman and Massaglia discussed the use of the 20 story building proposed to be erected on the premises for a 400-room hotel to be operated by Massaglia, if feasible.

Whitman reviewed with Massaglia the financial difficulties in which Debtor found itself. He informed him that Debtor was in Chapter XI and that he required $1,600,000 to pay off all debts and to clear the property of all liens and encumbrances; that once this was done the necessary financing for the Center could be obtained from institutional lenders and the development of the project could go forward unhindered.

While Massaglia has insisted that the pendency of Chapter XI proceedings was not discussed at this time or at any time prior to the spring of 1967, the testimony of Younes and Whitman is clear that it was. More importantly, when Whitman and Massaglia called Merton L. Schwartz on the telephone to prepare the Memorandum Agreement of November 18, 1966, Massaglia specifically asked Schwartz whether $1,600,000 would take care of all the liens and debts which were owed by the company in connection with the Chapter XI proceedings.

At the meeting there was some discussion of forming a corporation to develop the project and to call it "Massaglia Center" or some like name instead of "Whitman Center" because of the financial difficulties in which Debtor had found itself.

During the course of the meeting Massaglia offered to pay $1,600,000 for a half interest in the land and leasehold, free and clear of all liens and encumbrances and with the past due rent on the leasehold to be paid. The parties intended that the $1,600,000, to the extent required, would be used to pay all creditors in full. Whitman informally accepted this offer and, with permission of Massaglia, called his attorney, Merton L. Schwartz, on the telephone. He introduced Massaglia to Schwartz over the telephone and thereafter both Whitman and Massaglia requested Schwartz to prepare a Memorandum Agreement embodying the terms which they related to him. Schwartz prepared the Memorandum Agreement dated November 18, 1966 (Debtor's Exhibit No. 2) in accordance with the instructions of Whitman and Massaglia and delivered several counterparts to Whitman who arranged for their execution by Massaglia and himself. While no time for payment of this sum of $1,600,000 was specified in the Memorandum Agreement, Massaglia advised Whitman he would require 30 to 40 days for the purpose.

On November 29, 1966, Joseph S. Potts, Esq., counsel for Debtor, informed Referee Neukom of the contents of the Memorandum Agreement of November 18, 1966. He did not show it to him at the time, nor did he incorporate it in any petition at any time. At the end of December 1966, during a meeting in Referee Neukom's chambers, with counsel for the Girtons and Debtor present, Mr. Potts showed Referee Neukom the Memorandum Agreement and the latter did examine it at that time.

On or about December 3, 1966, Massaglia gave Whitman a $50,000 promissory note made payable to Whitman Center, Inc. with the intent that Debtor discount it and use the funds for its needs. An executed counterpart of that note is in evidence (Petitioners' Exhibit A). An arrangement was worked out with Union Bank in connection with the note, wherein on December 9, 1966, after Massaglia had given to the bank collateral in the form of a Certificate of Deposit, it issued its cashier's check to Massaglia for $50,000 who, in turn, endorsed it to Whitman (Petitioners' Exhibit B). Whitman admits that this sum of $50,000 was to apply on account of the $1,600,000 purchase price for the half interest in Whitman Center. This check was not deposited in Debtor's account, nor was any accounting made to the Court of the disposition of these monies. Approximately $25,000 was paid from these monies to the Girtons and they, in turn, ceased to press for a return of the leasehold to them. Referee Neukom did not know, at any time prior to September 19, 1967, that Whitman had received money from Massaglia.

During the month of December 1966, Whitman and Massaglia saw each other frequently. Sometime around the middle of that month Massaglia informed Whitman that the money for the half interest which he was acquiring would have to come from the refinancing of the Miramar Hotel properties and ever since that time Whitman knew that this would have to be the source of these funds. At about the same time Whitman furnished Massaglia with a copy of the Financial Statement of Whitman Center,

Inc. dated December 10, 1966 (Petitioners' Exhibit I).

Massaglia asked Whitman for a more formal agreement setting forth their relationship and, sometime in late December 1966, Whitman and Massaglia, both together, in at least two telephone conversations with Schwartz, related to him what they wanted to go into the Joint Venture Agreement, which he then prepared for signature by Debtor and Massaglia. In none of his discussions with them did Schwartz advise that the agreement be submitted to the Court for its approval. Schwartz had asked Massaglia whether he wanted to confer with other counsel before the Joint Venture Agreement was prepared and Massaglia informed him that Schwartz could represent the joint venture. Schwartz also prepared the Amendment to the Joint Venture Agreement and testified that the increase of Massaglia's interest from 50% to 51% was made at Massaglia's request, who told Schwartz that he was acting on the advice of his accountant-lawyer. Massaglia acknowledged that he requested the change in percentage from 50% to 51%.

The Joint Venture Agreement and the Amendment to Joint Venture Agreement (Debtor's Exhibit No. 1) were executed by the parties thereto on January 14, 1967. The date April 15, 1967 was inserted in paragraph 5 by Whitman after Massaglia informed Whitman that it would take him approximately 60 days to refinance the Miramar Hotel property. At the same time Massaglia gave to Whitman a handwritten letter dated 1/14/67 (Debtor's Exhibit No. 6) stating this his net worth was approximately $25,000,000 and that the Hotel Miramar alone was worth $15,000,000. Whitman accepted these statements at face value and made no independent check to verify them. Mr. Potts was advised of the execution of the Joint Venture Agreement and Amendment to Joint Venture Agreement within a few days after January 14, 1967. He did not consider it necessary to petition the Court for approval in advance of the time Massaglia was ready to put up the money for his half interest.

The Agreement and Amendment were never formally presented to the Referee for approval. Actually, he has no recollection of ever having seen them informally. He first saw them when annexed as an exhibit to the Petition for Leave to Sue Debtor in Possession filed by Petitioners on October 10, 1967.

*The Joint Venture Agreement and Amendment to Joint Venture Agreement of January 14, 1967, were fairly entered into.*

■ As between the parties, the Joint Venture Agreement and Amendment to Joint Venture Agreement of January 14, 1967 were fairly entered into. Neither Whitman nor Younes practiced any fraud on Massaglia. From November 18, 1966 on he knew that Debtor was in financial straits (The Agreement of January 14, 1967 uses these very words.) and in Chapter XI. On at least one occasion prior to January 14, 1967, Massaglia personally inspected the location of the property, this in the company of Younes. On December 9, 1966, he advanced $50,000 on account of the $1,600,000. Prior to executing the Agreement and Amendment, Massaglia knew that the transaction would have to be cleared through the Court. He requested that his percentage participation be increased from 50% to 51%. This was done. He was not acting under mistake or misapprehension of any kind. Nor does it appear that the Agreement was inequitable. He would be receiving a 51% interest in property, free of all liens and encumbrances, into which a great deal of spade work had already gone and which appeared to have great potential as a trading center if logically developed.

*The Agreement of January 14, 1967, was a valid contract between the parties thereto, but subject to the condition that it be approved by the Court.*

Petitioners attack the validity of this Agreement on a number of grounds.

First, they assert that the Agreement was not signed by Whitman Center, Inc. as Debtor in Possession and, therefore, it has no standing before the Court. Second, they assert that the Agreement is void because it was not submitted to the Court for its prior approval before execution. Finally, they claim that the Agreement calls for the sale of Debtor's assets and liquidation of its debts and that the sale is not one within the purview of Chapter XI where the authority of the court is limited to the approval of a sale involving perishable assets in an emergency. It is the opinion of the Special Master that none of these objections is tenable.

 It is true that the Agreement does not recite the fact that it is being made by Whitman Center, Inc. as Debtor in Possession, nor does the signature line show that it was executed by Whitman Center, Inc. as Debtor in Possession. It is equally true that there is a substantial difference between a person who is a debtor under Section 322 of the Bankruptcy Act and a person who is a debtor in possession under Section 342 of the Bankruptcy Act.[1] A debtor in possession has all of the title and exercises all of the powers of a trustee appointed under the Act, subject, however, at all times to the control of the Court and to such limitations, restrictions, terms and conditions as the Court may from time to time prescribe.

It is clear from a review of the evidence that the parties intended that this was a contract which would have to be approved by the Court and the failure to recite the words "Debtor in Possession" in the Agreement itself is not fatal to the Agreement. The Court has a right to assume that the contract was entered into by Whitman Center, Inc. as Debtor in Possession.

The second contention of Petitioners presents a much more serious problem for consideration. Should the Agreement have been presented to the Court for its approval before execution and was the failure on the part of the Debtor so to do fatal to its validity? In passing upon this question it must be understood that we are referring only to its validity at the time of execution. The contract was executory in nature. Paragraph 5 required the sum of $1,600,000 to be paid on or before April 15, 1967. Paragraph 6 provided that upon payment of the said sum Debtor was to convey the property to the joint venture, free and clear of all liens and encumbrances, and that all leasehold payments were to be current.

Let us assume that on April 1, 1967 an escrow had been opened into which Massaglia had deposited the monies required of him and that Debtor had petitioned the Court for authority to transfer to the joint venture the land and leasehold subject thereof and pay all of its creditors in full from these monies. Could the Court, at that stage in the proceedings, have taken the position that the Agreement was void because approval for its execution had not been obtained in advance and, therefore, it had no authority to receive the petition and act upon it? It would seem not. The Agreement of January 14, 1967, was, in effect, a plan of arrangement under which all creditors would have been paid in full by monies advanced by a joint venturer with Debtor then free to be-

---

1. Secs. 322 and 342 of the Bankruptcy Act, 11 U.S.C.A. §§ 722 and 742:

§ 722. *Same; original petition*

If no bankruptcy proceeding is pending, a debtor may file an original petition under this chapter with the court which would have jurisdiction of a petition for his adjudication."

\* \* \*

§ 742. *Continuance of Debtor in possession*

Where no receiver or trustee is appointed, the debtor shall continue in possession of his property and shall have all the title and exercise all the powers of a trustee appointed under this Act, subject, however, at all times to the control of the court and to such limitations, restrictions, terms, and conditions as the court may from time to time prescribe."

come the other joint venturer, had Massaglia complied with its terms.

All of the cases are in accord that no actual sale and transfer could have been made without the Court's approval in advance. Section 313(2) of the Bankruptcy Act [2] controls. Under it the Court is given the broad power of authorizing the Debtor in Possession to lease or sell any property of the Debtor upon such terms and conditions as the Court may approve and, of course, in this case the Court had the right either to approve or reject the Agreement when presented to it. However, that is not the question here. Rather, the question is: No matter how advantageous the Agreement might be for the Debtor and its creditors, must approval for its execution be obtained in advance? Counsel have not cited any cases directly in point and the Special Master has been unable to find any.

 Courts of Bankruptcy are inherently courts of equity and are required to do that which is fair and equitable to all parties. With this caveat there would seem to be no logical reason why a debtor in possession cannot enter into a contract with another, valid in the first instance, as between them, but subject to the condition that the Court to whom it must be submitted may ultimately either approve it or reject it.

Petitioners have raised the point that the Court has no jurisdiction over the subject matter of the Agreement in a Chapter XI proceeding and that it is governed by the law as set forth in the case of In Re Pure Penn Petroleum Co., 188 F.2d 851, 24 A.L.R.2d 1206 (2d Cir. 1951). In that case the Court permitted a debtor in possession to sell all of its assets which cost some $600,000 for the price of $29,500, this over the objection of a creditor who appealed. The Circuit Court, in a split decision, reversed the trial court on the grounds that there was no proper showing that the assets were of a perishable nature or that a true emergency existed and, in the absence of these conditions, the Court had no authority to approve the sale.

The facts in that case are substantially different from the case at bar. There, a large amount of assets which cost a great deal of money were being sold for a small amount. Certain classes of unsecured creditors were being favored as against other unsecured creditors and all of the assets were being sold. In the case under consideration here, in effect, only half of the assets of the Debtor would be sold at a price which would pay off in full all creditors, secured and unsecured, and under a plan which would permit the orderly development of the land owned and leased by Debtor along the lines originally contemplated.

*Events leading to the execution of the note and deed of Trust on May 24, 1967, in the principal sum of $1,600,-000.00 in favor of Joseph C. Whitman*

Subsequent to the execution of the Agreement of January 14, 1967, Whitman and Massaglia made a series of efforts to raise money by refinancing the Miramar Hotel properties. On or about February 6, 1967, Massaglia caused to be prepared by Irving Kaufman, a certified public accountant, statements of the financial condition of Massaglia and his wholly owned or controlled corporations and partnerships as of January 31, 1967, to be presented to lending

---

2. Sec. 313 of the Bankruptcy Act, 11 U.S.C.A. § 713:

§ 713. *Same; administration of estate*

Upon the filing of a petition, the court may, in addition to the jurisdiction, powers and duties [hereinabove and elsewhere in this chapter] conferred and imposed upon it—

\* \* \*

(2) upon such notice as the court may prescribe and upon cause shown, authorize the receiver or trustee, or the debtor in possession, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the court may approve;"

agencies (Debtor's Exhibit No. 4). In the statements the 51% interest in the land at Anaheim, California, is shown as an asset and the balance due on the Agreement of January 14, 1967, listed at $1,500,000, is shown as a liability. Mr. Kaufman testified in the proceedings before the Special Master that this information was furnished to him by Massaglia. That statement clearly shows that the money required to be paid by Massaglia under the Agreement of January 14, 1967, could only come from a refinancing of the Miramar Hotel properties.

It will be recalled that Massaglia had advanced to Whitman $50,000 on or about December 9, 1966, and by January 31, 1967 Massaglia had agreed to advance to Whitman another $50,000. Whitman claims that this second $50,-000.00 was to be in the form of a personal loan to him to be repaid from the earnings of the joint venture. As of January 31, 1967, Massaglia was treating it as an advance against the price of $1,600,000 due to Debtor. Of this $50,000, $35,000 was given to Whitman in the form of a cashier's check drawn on the Santa Monica Branch of the Bank of America on February 14, 1967 (Petitioners' Exhibit G), and additional sums aggregating approximately $15,-000 were made available to him by Massaglia in subsequent months, the last payment of $5,000 being made to Whitman on or about May 8, 1967.

From the monies received by Whitman from Massaglia on February 14, 1967, he paid Gulf Oil Corporation $25,000 on account of the indebtedness of Whitman Center, Inc. to it. This payment of $25,000 was the only one ever made to Gulf Oil Corporation from December 11, 1964 to date on account of the note and deed of trust given by Debtor to Gulf Oil Corporation.

Whitman and Massaglia had planned to conduct the joint venture in the name of a corporation and, on or about January 20, 1967, attorney Merton L. Schwartz prepared Articles of Incorporation of Massaglia Plaza Center, Inc. which were executed by Whitman, his wife, Cecele Whitman, Joe Massaglia, Jr. and Dora May Priester, an employee of the Miramar Hotel. These Articles of Incorporation (Debtor's Exhibit No. 3) were never filed with the Secretary of State but were held pending the payment by Massaglia of the monies to Debtor under the Agreement of January 14, 1967.

In the months of February, March and April, 1967, Whitman and Massaglia had some meetings with mortgage people and bankers and there was general talk of a loan on the Miramar Hotel property, but nothing of any consequence developed therefrom. On April 18, 1967, Dr. Emile Bernston, one of the appraisers who prepared the appraisal report on the Anaheim property (Debtor's Exhibit No. 12), met with Massaglia at the Hotel Miramar. The purpose of the meeting was to discuss the preparation by Dr. Bernston of an appraisal of the Miramar Hotel properties so that Massaglia could secure refinancing on the hotel and pay Whitman from the proceeds thereof. Massaglia and Whitman continued their efforts to secure refinancing. In these efforts Younes joined. Younes had a particular interest in Whitman and Massaglia because he had brought them together in the first instance and, during the course of their dealings with each other, he had written two whole life insurance policies, one on the life of Massaglia for $250,000 and one on the life of Whitman for $1,000,000. Massaglia paid the premiums on these policies. Younes received some $18,000 in commissions as a result of writing these policies. April 15, 1967 came and went and there was no loan in the offing and no prospects of the payment of the monies by Massaglia in the immediate future. Whitman kept pressing Massaglia for a solution to the money problem.

Massaglia was planning to leave for Europe on an extended trip beginning on May 24 or May 25, 1967. Younes was visiting with Massaglia at the Miramar Hotel on the evening of May 23rd and

discussed with him the problem of coming up with the money. During the course of their conversation Massaglia asked Younes if Whitman would agree to take a trust deed on the Miramar Hotel for the $1,600,000 Younes called Whitman and Whitman said that this would be a good thing to do because it would be evidence that Massaglia meant to go through with the transaction and this could be demonstrated to the Court. Younes reported this conversation with Whitman to Massaglia and Massaglia instructed Younges to prepare a note and deed of trust on the Miramar Hotel property in the sum of $1,600,000. and to arrange for Whitman to come in on May 24th to receive the same. Younes arranged for the preparation of the note and deed of trust pursuant to Massaglia's instructions. The actual typing was done by Miss Stone, Massaglia's secretary. After the documents were typed up, a meeting was held in the dining room of the Miramar Hotel at which Younes, Whitman and Massaglia were present in the first instance. Irene Krichbaum joined them later. All of the handwriting in the two documents was inserted at the time the parties met and prior to execution of the note and deed of trust (Petitioners' Exhibit J–1). Miss Krichbaum did not want to sign the documents at first and asked specifically of Massaglia whether he wanted it done. Massaglia answered that he did and she then proceeded to execute the two documents, this sometime after Massaglia had executed them.

No acceptable explanation was given as to why the documents were made in favor of Joseph C. Whitman instead of Debtor. At the time Whitman received this note and deed of trust from Massaglia he knew that there were a number of deeds of trust already placed on the property which totaled not less than $2,400,000. On the same day that the note and deed of trust were executed by Wilshire-Miramar, Inc. and Miramar Properties, Inc. the corporation, Wilshire-Miramar, Inc., acting through its board of directors, passed a resolution authorizing the execution by Massaglia of the deed of trust (Debtor's Exhibit No. 8).

*Events following execution of note and deed of Trust of May 24, 1967*

Whitman caused the deed of trust to be recorded on May 29, 1967. He made some effort to sell the note at a discount but without success. In June 1967, for the first time, he inquired about and learned the extent of the outstanding loans on the Miramar Hotel property. Massaglia returned from Europe sometime late in June, 1967, but was sick upon his return and was hospitalized by his doctor. On July 20, 1967, at a meeting where Massaglia, Dora May Priester and Younes were present, Whitman was asked to subordinate the deed of trust of May 24, 1967 to a new second deed of trust on the Miramar Hotel property, which would be in the amount of approximately $1,000,000. Whitman agreed so to do and executed a subordination document (Debtor's Exhibit No. 7). Whitman executed this subordination agreement on July 20, 1967, despite the fact that on June 30, 1967 he had executed an assignment of the deed of trust in favor of Debtor. This latter assignment was not recorded, however, until August 21, 1967.

On August 11, 1967, Miramar Properties, Inc. and Wilshire-Miramar, Inc., by Joe Massaglia, Jr., President, executed a Notice of Rescission in which demand was made for the return of the note of May 24, 1967 and of the deed of trust securing it, together with a Request for Full Reconveyance of the deed of trust (Petitioners' Exhibit L). This Notice of Rescission was recorded in the office of the County Recorder of Los Angeles County, California, on August 18, 1967, and an executed copy thereof was served on Joseph C. Whitman on August 24, 1967. Upon receipt of said notice Whitman arranged for a meeting at which Massaglia, Massaglia's attorney, Conrad T. Bjornlie, Whitman's attorney, Merton L. Schwartz, and Younes were present, among others. Whitman tried to have

the Notice of Rescission of August 11, 1967 vitiated and, while there was some talk about it at the meeting, no agreement to do this was arrived at.

The Court was not advised of the existence of the note and deed of trust of May 24, 1967 or of the assignment of the same to Debtor until September 19, 1967, at a hearing before Referee Neukom involving Debtor and Gulf Oil Corporation. At the same hearing Whitman informed the Court that Massaglia had wanted to rescind the transaction, but had changed his mind and now wanted to go through with it. Whitman did not inform the Court at that time of the existence of a recorded Notice of Rescission. On October 10, 1967, Petitioners filed their Petition for Leave to Sue Debtor in Possession and attached thereto as exhibits the Joint Venture Agreement of January 14, 1967 and the Notice of Rescission of August 11, 1967. This was the first time Referee Neukom ever saw either of these documents.

*There was no consideration for the execution by Wilshire–Miramar, Inc. of the note and deed of trust dated May 24, 1967, and the corporation is entitled to the return of these documents.*

█ The resolution of the board of directors of Wilshire-Miramar, Inc. dated May 24, 1967 (Debtor's Exhibit No. 8) expressly authorized Joe Massaglia, Jr., President, "to execute and deliver to Joseph C. Whitman, President of Whitman Center, Inc., a deed of trust in the sum of $1,600,000 for the purchase of 51% interest in the Whitman Center, Inc. project." There is nothing in the record to show an agreement between Wilshire-Miramar, Inc. and Debtor under which Debtor would accept the deed of trust in exchange for a 51% interest in the Whitman Center, Inc. project. No court approval was sought or obtained with respect to this transaction. The Joint Venture Agreement between Massaglia and Debtor of January 14, 1967 was still in effect insofar as the parties thereto were concerned. There is no evi-

dence of any assignment of that Agreement, or any of his interest therein, by Massaglia to Wilshire-Miramar, Inc. There is nothing in the record to show that Wilshire-Miramar, Inc. was the alter ego of Massaglia. The fact that Massaglia was the sole shareholder of Wilshire-Miramar, Inc. does not, in and of itself, validate the transaction. Wilshire-Miramar, Inc. is entitled to have the transaction involving the note and deed of trust set aside. It is entitled to have Debtor return to it the note and deed of trust of May 24, 1967 and to have Debtor execute in favor of Wilshire-Miramar, Inc. a Request for Full Reconveyance in order to clear the record. In view of the foregoing ruling, it follows that the purported assignment from Joseph C. Whitman to Debtor of the deed of trust dated June 30, 1967 and recorded on August 21, 1967, likewise, has no validity.

The Notice of Rescission dated August 11, 1967 set forth three grounds: (1) that Massaglia was ill and under heavy sedation and signed the note and deed of trust without understanding the true nature of the transaction and contents of the documents; (2) the lack and/or failure of consideration for the transaction; and (3) the connivance and/or false representations on the part of Joseph C. Whitman of the facts relating to the transaction.

This Notice of Rescission was followed up by an action entitled Joseph C. Massaglia, Jr. and Wilshire-Miramar, Inc., a California corporation, Plaintiffs, versus Joseph C. Whitman, Whitman Center, Inc., a California corporation, Whitman Center, Inc., a California corporation, Debtor in Possession in proceedings for arrangement under Chapter XI of the Bankruptcy Act, Phillip Younes, Does I to X inclusive, Defendants, filed on December 4, 1967 in the Superior Court of the State of California in and for the County of Los Angeles, No. 922,612, in which plaintiffs, in a Complaint For Fraud, Rescission And Damages, seek to have the note and deed of trust of May 24, 1967 set aside and rendered null and

void and of no force and effect. Debtor and Whitman cross-complained for specific performance of the provisions of the joint venture agreement and for payment of the sum of $1,600,000.

In this bankruptcy proceeding here in Federal Court, we on February 29, 1968 issued a restraining order enjoining Massaglia, Wilshire-Miramar, Inc., Whitman and Debtor corporation from any further prosecution of the said Los Angeles Superior Court action, and in view of our decision now made, this restraining order should be made permanent.

With respect to the grounds set forth in the said Notice of Rescission, it is clear that the *first* ground—Massaglia's illness, sedation and lack of understanding—was not proved. The evidence introduced by Petitioners, through Dr. Carl Zabbia, Massaglia's personal physician, to the effect that on May 24, 1967 Massaglia was ill, under heavy sedation and lacked understanding was not persuasive. Dr. Zabbia had not examined Massaglia for some two weeks prior to May 24, 1967. Massaglia's condition was certainly not such as to prevent him from going on an extended trip the day after he signed the documents, first to Indianapolis and then to Europe. There is nothing in the record to show that Massaglia did not understand the significance of the documents which he was executing on behalf of Wilshire-Miramar, Inc.

With respect to the *third* ground—connivance or false representations by Whitman—there is no evidence of any kind indicating connivance or false representations on the part of Joseph C. Whitman with respect to the execution by Massaglia and Irene Krichbaum of the note and the deed of trust on May 24, 1967.

Therefore, our ruling here is limited to the *second* ground—lack and failure of consideration—by our determination that Wilshire-Miramar, Inc. did not and, in the circumstances, could not receive any consideration moving from Joseph C. Whitman and/or Debtor for the execution by it of the note and deed of trust, nor did it receive any consideration from Massaglia for the same.

*The Agreement of January 14, 1967, was improvidently entered into between the parties thereto, provides no ready benefits to the creditors and to the Debtor in Possession and should be rejected by the Court.*

Even though the contract was fairly entered into between the parties, there is no question that it was improvidently made. In the case of Debtor, the record is clear that Whitman made no check through independent sources of Massaglia's financial means before executing the Memorandum Agreement of November 18, 1966. He was content to accept Massaglia's statement that the money would be forthcoming in 30 to 40 days. Whitman was a victim of self-delusion. He wanted to believe that the money would be forthcoming and did not take the steps that an ordinary and prudent person should have taken in the circumstances. Although, by mid-December of 1966, he knew that Massaglia was counting on the refinancing of the loans on the Miramar Hotel properties as a source of funds, Whitman, nevertheless, went ahead with the preparation and execution of the Agreement of January 14, 1967 without making any further inquiry as to the status of the then existing loans or other possible sources of Massaglia money in the event that refinancing could not be obtained. On January 14, 1967, at the time of the execution of the Agreement, he accepted a handwritten statement by Massaglia that the latter was worth $25,000,000 and that the Miramar Hotel properties were worth approximately $15,000,000 without question or further investigation.

By February 6, 1967, Whitman knew from Massaglia's financial statement prepared by accountant Kaufman that the only ready source of money would have to be from the refinancing of the Miramar Hotel properties. At no time since that date is there anything in the record to indicate that the refinancing

of these properties was even close to being accomplished. And, even at the present time, there is nothing to show that this can be accomplished in the near future.

In the case of Massaglia, he entered into the Memorandum Agreement of November 18, 1966 without even examining the property subject thereof. He did not check out the leases shown to him by Whitman. He did not have his own attorney participate in the preparation of the Agreement. He seemed content to accept the statements made by Whitman and, on December 9, 1966, advanced to Whitman $50,000 on account of the $1,600,000 he had obligated himself to pay. Although he knew that the balance of the money could only come from a refinancing of the Miramar Hotel properties, there is nothing in the record to show that he made any earnest effort to determine whether such refinancing was feasible before executing the Agreement of January 14, 1967. He, also, was a victim of self-delusion, blithely assuming that the refinancing would be accomplished by April 15, 1967, the time set in the Agreement for the payment of the balance of the monies. Again, he did not have independent counsel prepare or at least review the Agreement before he executed the same. Considering the amount to be paid by Massaglia and the fact that Debtor was in Chapter XI at the time, the Agreement does not have in it a number of simple safeguards which should have been inserted for the protection of Massaglia. This is not intended in any way as a reflection on the integrity of attorney Merton L. Schwartz but, since he undertook to act as "attorney for the situation," he should at least have had the following provisions in the Agreement:

(1) A requirement that the Agreement be submitted to the Court within a stated period after its execution and if approval were not obtained by a stated date, then the Agreement was to become a nullity.

(2) A provision reciting that Massaglia was expressly relying upon the representations of Whitman which representations should have been set out in some little detail.

(3) A provision requiring deposit of the funds in escrow and describing the mechanics of the transfer from Debtor to Massaglia.

In conducting the affairs of Debtor, Whitman did not seem to understand his responsibility to the Court and the duty of Debtor to keep the Court regularly informed. Debtor was a trustee. When Massaglia did not put up the balance of the $1,600,000 on April 15, 1967, Debtor was duty bound to inform the Court, in formal petition, of the Agreement of January 14, 1967, of the fact that it had received not less than $50,000 on account and the manner of the disposition of this sum. At that time, Debtor should have sought approval of the Agreement and an order seeking its implementation. Even though he had not kept his part of the bargain, Massaglia was entitled to know whether the Court would approve or reject the Agreement and, if it approved the Agreement, he would be further entitled to know how it was to be implemented.

Likewise, the transaction of May 24, 1967, involving the note and deed of trust from Wilshire-Miramar, Inc. to Whitman, should have been presented to the Court for approval or rejection, in formal petition, as soon after that date as possible.

It is only after Petitioners attacked the Agreement of January 14, 1967, in October of that year, that Debtor belatedly stirred itself to seek the Court's counsel and help. At this late stage in the proceedings the Court is being asked, in effect, to enforce specifically the Agreement of January 14, 1967 with no assurance whatsoever that such action will produce the funds required to pay off all creditors in full. Except for Massaglia's volunteered letter of January 14, 1967 as to his worth and the "Financial

Statement" of January 31, 1967, the record is bare as to the state of his finances. These, standing alone, offer but cold comfort. It may very well be that a forced liquidation of Massaglia's assets would succeed in destroying him without producing the balance of the monies due from him under the Agreement of January 14, 1967. In the meantime, Debtor has had the use of $50,000 of Massaglia's money, $25,000 of which went to Gulf Oil Corporation and the other $25,000 to the Girtons, lessors of the 99-year leasehold.

As between Massaglia and Debtor, even though both are seriously at fault, the greater burden, if not the greater fault, was upon Debtor. It did not properly discharge its duties as Debtor in Possession and, in the absence of any showing that its creditors reasonably stand to be benefitted by enforcement of the Agreement of January 14, 1967, the Agreement should be rejected. The Court is a court of equity. If at a later time Debtor should come into possession of sufficient money which will enable it to pay all of its other creditors in full and all expenses of administration as well, and if it should have in its hands any additional funds, then, and in that event, the Court should direct that Massaglia receive these additional funds to the extent the same are available, but in no event to exceed the sum of $50,000.

*The Court has exclusive jurisdiction over the Debtor in Possession and its property and its approval must be* *obtained in advance of the actual sale and transfer of said property.*

This principle has been established by the cases over so long a period of time that citation of authority in support of it would be superfluous.

Section 313(2) of the Bankruptcy Act[3] confers jurisdiction upon the court to authorize a sale upon cause shown. What constitutes cause sufficient to warrant a sale must necessarily depend on the circumstances in each case. The Court is required to determine whether such sale is to the advantage of the estate and will aid the ultimate objective of the proceeding.[4] If it makes a favorable determination, then it has the duty of authorizing the sale. If its determination is adverse, it should reject the sale.

Applying these principles to the facts now before the Court for its consideration, the Court has a right to conclude that the proposed sale of a half interest in Debtor's property to Massaglia, as embodied in the Agreement of January 14, 1967, coupled with the fact that Massaglia had been unable to raise the money required of him prior to October 10, 1967 and thereafter has sought to repudiate said Agreement is not a sale which is to the advantage of the estate, nor will it aid the ultimate objective of the proceedings. At the very least, it is an improvident sale and should not be permitted.[5] The Court has the duty to, and must, reject it.

In accordance with the foregoing, which shall also constitute findings of

---

3. See Footnote 2, supra.

4. Sec. 311 of the Bankruptcy Act, 11 U.S.C.A. § 711:

 § 711. *Exclusive jurisdiction of debtor and property.*

 Where not inconsistent with the provisions of this chapter, the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located."

 See also COLLIER ON BANKRUPTCY (14th Ed.) ¶ 3.16[3] pp. 242–243:

 "[3]—*Cause for Authorizing Lease or Sale.*

Section 313(2) confers jurisdiction to authorize a lease or sale upon 'cause shown'. What constitutes cause sufficient to warrant a lease or sale must necessarily depend on the circumstances of each case. As a general proposition, the lease or sale should be authorized where it is to the advantage of the estate and will aid the ultimate objective of the proceeding; an improvident sale should not be permitted."

5. See references in Footnote 4, supra.

fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P., the Court now makes it formal Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Whitman Center, Inc., hereinafter in these Findings of Fact referred to as "Debtor", is a California corporation formed on April 13, 1961. Its authorized capital stock issued and outstanding consists of 100 shares of no par value. These shares were issued at $10 per share, 50 shares to Joseph C. Whitman, and 50 shares to his wife, Cecele Whitman, on or about January 19, 1966. They have been and presently are the owners of said shares which, since that date, have been held in escrow by Merton L. Schwartz, Esq., pursuant to the order of the Commissioner of Corporations of the State of California, issued on January 19, 1966, appointing him Escrow Holder.

2. Since the formation of Debtor, Joseph C. Whitman, hereinafter in these Findings of Fact referred to as "Whitman," has been and still is the President of Debtor and in complete charge of its affairs making all pertinent decisions and receiving and disbursing all funds of Debtor in whatever manner he deemed best. The business of Debtor was carried on by Whitman in the most informal manner and its corporate records and books of account are sketchy and fragmentary.

3. In 1961, Debtor acquired from its predecessor in interest, B & W Productions Corporation, approximately 15 acres of land at Harbor Boulevard and Chapman Avenue in the city of Anaheim, California, not far from Disneyland. This land was in fee subject to encumbrances of record. At about the same time Debtor had transferred to it from its said predecessor a 99-year leasehold on approximately 10 acres of adjacent land under lease from W. H. Girton and Ruth H. Girton at an annual rental of $24,000. Debtor also acquired parking rights on fifteen acres of land adjacent to the two parcels above described. Debtor proposed to develop these properties as a shopping or trade center with financing obtained from institutional lenders.

4. In June 1962, Debtor filed a Petition for Arrangement under Section 322 of the Bankruptcy Act. While under the aegis of the Court and with its permission, Debtor sold to Gulf Oil Corporation, on or about December 11, 1964, the approximately 15 acres owned by it in fee for $1,350,000. It immediately repurchased from Gulf Oil Corporation all of said land except for a corner lot of 150 ft. for $1,220,000, of which $250,000 was in cash and the balance of $970,000 in the form of a note bearing interest at 9.9% per year and secured by a first deed of trust on said land which was now determined to be 14.21 acres. The money received by Debtor from Gulf Oil Corporation was monitored by the Court and was used to pay off all creditors in full. The proceedings were then terminated and the remaining assets reverted to Debtor.

5. On August 10, 1966, Debtor filed a new Petition for Arrangement and since that time has been and is now operating as a Debtor in Possession under the jurisdiction of the Court.

6. Debtor had made no payment of either interest or principal on its note to Gulf Oil Corporation from December 11, 1964 to August 10, 1966, and had paid no rent to the Girtons on the leasehold from February 1, 1965 to August 10, 1966.

7. Debtor was without funds and its only outlook for development of its property was to interest prospective major tenants and other smaller tenants in the project, get them to sign leases and then seek necessary financing on the strength of those leases. In pursuit of this objective, in the year 1966 Debtor did obtain signed leases from Thrifty Drug Stores and Van De Kamp Bakeries and negotiated leases with Goodyear and Food Fair Markets, among others. Before these leases could come into being, it was incumbent upon Debtor, at its expense, to build the necessary structures or provide

the required space for occupancy by said lessees.

8. Debtor had no possibility of obtaining necessary financing to develop the project on the strength of these leases so long as the fee land was encumbered with the deed of trust to Gulf Oil Corporation. Debtor then began to seek out an investor who would purchase an interest in the project and join with Debtor in the development of the same.

9. In November 1966, Whitman met Joe Massaglia, Jr., hereinafter referred to in these Findings of Fact as "Massaglia," for the purpose of interesting him to become an investor in the project. The meeting was arranged by one Phillip A. Younes, an insurance agent who knew both men and who, in past conversations with Massaglia, had learned that the latter was seeking outside investments which would afford him tax advantage.

10. Massaglia was a hotel owner and operator of considerable experience extending over many years. He had ownership interest at one time in the New Yorker Hotel, New York City, and the Waikiki Biltmore in Honolulu, among other hotels, and, at the time of his meeting with Whitman, was the sole shareholder of Miramar Properties, Inc. and Wilshire-Miramar, Inc. which owned and operated the Miramar Hotel in Santa Monica, California. At that time he also had a two-thirds ownership interest in the Franciscan Hotel, Albuquerque, New Mexico, which was leased to the Hilton Hotels. Massaglia was a man of considerable business experience.

11. At the time of their first meeting in November 1966, Whitman reviewed the project with Massaglia; informed him of the plans for its development; showed him the leases already signed and those negotiated but not yet signed; advised him of the financial difficulties of Debtor and that Debtor was in Chapter XI; told him that $1,600,000 was required to pay off all of debtor's creditors in full, and that this sum would free the land of all liens and encumbrances and would make possible the obtaining from institutional lenders all other financing necessary for the orderly development of the project.

12. At this meeting Massaglia, in the presence of Younes, offered to purchase a 50% proprietary interest in the assets of Debtor for $1,600,000 with the understanding that this money, to the extent required, would be used to pay all of Debtor's creditors in full, free the land and leasehold of all liens, encumbrances and claims for rent, and make it available for development by Debtor and Whitman on one hand and Massaglia on the other; that there would be some form of joint undertaking, either as a corporation or in some other form which would develop the property, this to be determined later. Massaglia advised Whitman that he could have this money available within 30 to 40 days. Whitman informally accepted the offer.

13. From their place of meeting at the Miramar Hotel, Whitman and Massaglia then conferred on the telephone with Merton L. Schwartz, an attorney who had theretofore represented Whitman and Debtor. Whitman called Schwartz after informing Massaglia that Schwartz was his attorney. Both Whitman and Massaglia requested Schwartz to prepare a Memorandum Agreement in accordance with certain terms which they then related to him.

14. Schwartz then prepared the Memorandum Agreement of November 18, 1966 (Debtor's Exhibit No. 2) in accordance with the instructions given to him and Whitman and Massaglia executed the same on or about November 18, 1966.

15. Whitman made no independent check of Massaglia's financial means before executing the Memorandum Agreement of November 18, 1966. Massaglia did not personally inspect the property in Anaheim, or check out the leases shown to him by Whitman, or consult the records of the Bankruptcy Court with respect to Debtor, before he executed that Agreement.

16. On November 29, 1966, Joseph S. Potts, counsel for Debtor, informed Ref-

eree Norman W. Neukom of the contents of the Memorandum Agreement between Whitman and Massaglia, characterizing it as a commitment of $1,600,000 for a half interest in Debtor's property. He did not show the document to Referee Neukom at that time, nor did he incorporate it in any petition at any time. Referee Neukom was shown the Memorandum Agreement in late December 1966.

17. On or about December 9, 1966, Massaglia gave to Whitman the sum of $50,000 in the form of a cashier's check issued by Union Bank to Massaglia and endorsed by him in blank (Petitioner's Exhibit B). This was to replace a note for $50,000 given by Massaglia to Debtor on December 3, 1966 which Debtor was unable to discount. Petitioners' Exhibit A is a counterpart of that note. This payment was an advance against the $1,600,000 which Massaglia was to pay under the Memorandum Agreement. Debtor did not report this payment to the Court.

18. Whitman cashed the check and did not deposit any of the funds in Debtor's bank accounts, but did use $25,000 of these funds for a cashier's check issued by Ahmanson Bank on December 14, 1966, which check was made payable to the Girtons, lessors of the 99 year leasehold, and delivered to their counsel.

19. In mid-December 1966, Massaglia informed Whitman that the balance of the $1,600,000 could only come from the refinancing of the Miramar Hotel properties. Whitman did not then cause a check to be made to determine the extent of the indebtedness on said hotel properties, nor did he at any time thereafter until sometime in June 1966.

20. In late December 1966, Massaglia requested a more formal agreement to replace the Memorandum Agreement of November 18, 1966. Both Whitman and Massaglia, acting together, conferred by telephone with Schwartz and requested him to prepare a Joint Venture Agreement in accordance with terms which they then related to him. Schwartz prepared the Joint Venture Agreement and Amendment to Joint Venture Agreement (Debtor's Exhibit No. 1) in accordance with these terms, except for the handwritten portions which were filled in by Whitman and initialed prior to execution on January 14, 1967.

21. April 15, 1967 was agreed upon by Whitman and Massaglia as the time on or before which Massaglia would have the balance of the money. The ownership interest of Massaglia was changed from 50% to 51% at his request made upon the advice of his accountant-lawyer who did not see the Agreement prior to its execution. At the time of its execution Massaglia gave Whitman a handwritten letter to the effect that his net worth was approximately $25,000,000, including the Miramar Hotel properties which alone had a value of $15,000,000 (Debtor's Exhibit No. 6). Whitman made no effort to verify these representations.

22. Joseph S. Potts was informed of the execution of the Agreement of January 14, 1967, within a few days of its date. He knew that the money had to be paid by Massaglia on or before April 15, 1967. The Agreement of January 14, 1967 was not presented to the Court for approval at any time either before or after the date of its execution. The first time Referee Neukom saw this Agreement was on October 10, 1967, when Petitioners filed with the Referee their Petition to Sue Debtor in Possession, seeking leave to sue in the California State Superior Court.

23. On or about February 14, 1967, Whitman received $35,000 from Massaglia. Of this sum Whitman paid $25,000 to Gulf Oil Corporation on account of the note and deed of trust on the fee property of Debtor. Massaglia advanced additional sums to Whitman between February 14, 1967 and May 8, 1967 which aggregated approximately $15,000. Whitman did not report to the Court the receipt of these monies from Massaglia or the payment by debtor to Gulf Oil Corporation.

24. From and after February 6, 1967, Whitman was fully aware that the money required to be paid by Massaglia under the Agreement of that date could only come from a refinancing of the Miramar Hotel properties. While he and Massaglia talked from time to time to mortgage people and bankers about the possibility of such refinancing, no commitment for the same was ever obtained from any lender.

25. From and after February 6, 1967, Whitman knew that there were several deeds of trust on the Miramar Hotel properties aggregating in excess of $2,-400,000. He did not check out the status and amount of any of these deeds of trust until June 1967.

26. The execution by Wilshire-Miramar, Inc. of a note and a deed of trust in the sum of $1,600,000 on May 24, 1967 (Petitioners' Exhibit J–1) in favor of Joseph C. Whitman was ordered by Massaglia and delivered to Whitman and accepted by the latter as evidence of Massaglia's good faith and continuing intention to go through with the Agreement of January 14, 1967.

27. The note and deed of trust of May 24, 1967 were hurriedly drawn and were only partially complete. The deed of trust securing the note was a fifth deed of trust on the Miramar Hotel properties. Whitman had no reasonable expectation of being able to sell this note and deed of trust for the balance due from Massaglia under the Agreement of January 14, 1967.

28. Wilshire-Miramar, Inc. received no consideration from either Debtor, Whitman or Massaglia for the execution by it of the note and deed of trust of May 24, 1967.

29. On May 24, 1967, Massaglia was in good health and understood the nature of the transaction by which Wilshire-Miramar, Inc. executed the note and deed of trust for $1,600,000 in favor of Joseph C. Whitman.

30. On July 20, 1967, Whitman personally executed a handwritten subordination agreement in favor of Wilshire-Miramar, Inc. by which he agreed to subordinate the deed of trust of May 24, 1967 to a new $1,000,000 second deed of trust on the Miramar Hotel property (Debtor's Exhibit No. 7), this in the face of the fact that he had already assigned the deed of trust of May 24, 1967 to Debtor on June 30, 1967.

31. On August 11, 1967, Miramar Properties, Inc. and Wilshire-Miramar, Inc. executed a Notice of Rescission in which demand was made for the return of the note and deed of trust of May 24, 1967, given to Joseph C. Whitman and further demand was made for an execution by him of a Request for Full Reconveyance of that deed of trust (Petitioners' Exhibit L). This Notice of Rescission was recorded in the office of the County Recorder of Los Angeles, California, on August 18, 1967, and an executed copy thereof served on Joseph C. Whitman on August 24, 1967.

32. Whitman sought unsuccessfully to have the Notice of Rescission of August 11, 1967 recalled by its issuers. From and after August 11, 1967, its issuers intended that it continue in full force and effect and that the demands contained therein be complied with.

33. Whitman did not inform the Court of the Notice of Rescission of August 11, 1967 and of its service upon him prior to October 10, 1967, when Petitioners filed their Petition for Leave to Sue Debtor in Possession.

34. Throughout the entire course of dealing with Massaglia, extending from November 18, 1966 to October 10, 1967, Debtor failed to exercise properly its duties as Debtor in Possession, in that it neglected to keep the Court fully informed of the status of the Agreement of January 14, 1967, of the receipt of money from Massaglia and the manner of its disbursement, of Massaglia's failure to pay the balance of the money under the Agreement, of the receipt from Wilshire-Miramir, Inc. of the note and deed of trust of May 24, 1967, and of the Notice of Rescission of August 11, 1967.

35. Petitioners seasonably filed their Petition for Review of the Order of Referee Norman W. Neukom dated December 13, 1967.

36. The following Conclusions of Law, insofar as they may be concluded to be Findings of Fact, are so found by the Court to be true in all respects. From the foregoing facts, the Court concludes:

## CONCLUSIONS OF LAW

### I

The Court has exclusive jurisdiction of the Debtor, its property, the parties to the Petition for Review on file herein and all matters pertaining to the dealings between Debtor on one hand and Joe Massaglia, Jr., Miramar Properties, Inc. and Wilshire-Miramar, Inc. on the other, this pursuant to the provisions of Sections 311, 313(2), 322 and 342 of the Bankruptcy Act (11 U.S.C.A. §§ 711, 713(2), 722 and 742.)[6]

### II

The Joint Venture Agreement and Amendment to Joint Venture Agreement of January 14, 1967 between Debtor and Joe Massaglia, Jr. was negotiated by them in good faith and was voluntarily entered into by both parties thereto.

### III

The Joint Venture Agreement and Amendment to Joint Venture Agreement of January 14, 1967 was a valid agreement between the parties thereto, subject to the condition that approval of the Court had to be first obtained before the terms of said Agreement could be carried out.

### IV

On April 14, 1967, or as soon thereafter as possible, Debtor should have submitted the Agreement of January 14, 1967 to the Court for its consideration and approval or rejection, and its failure so to do was a breach of its duty as Debtor in Possession.

### V

There was no consideration for the note and deed of trust of May 24, 1967 given by Wilshire-Miramar, Inc. to Joseph C. Whitman and assigned by him on June 30, 1967 to Debtor. Wilshire-Miramar, Inc. is entitled to the return of that note and deed of trust and to a Request for Full Reconveyance executed by Debtor.

### VI

Joe Massaglia, Jr., having failed to raise the balance of the $1,600,000 purchase price by April 15, 1967, as provided for in the Agreement of January 14, 1967, and his failure so to do not having since been remedied, the Agreement of January 14, 1967 and the sale and transfer of Debtor's property provided for therein, is not and are not to the advantage of Debtor's estate and does not and do not aid the ultimate objective of the proceedings.

### VII

There is no cause shown by Debtor within the meaning of Section 313(2) of the Bankruptcy Act to warrant the sale and transfer of Debtor's property under the Agreement of January 14, 1967.

### VIII

The sale and transfer of Debtor's property under the Agreement of January 14, 1967, in the light of the facts as they existed on April 15, 1967, was an improvident sale and transfer which should not be permitted.

### IX

The Agreement of January 14, 1967 should be disapproved and rejected by the Court.

### X

 Debtor has benefitted to the extent of $50,000 paid by Joe Massaglia, Jr. on account of the $1,600,000 purchase price recited in the Agreement of January 14, 1967. Said Massaglia, Jr. is entitled to the return of said sum from

---

6. All set forth in notes 1, 2 and 4, supra.

Debtor. However, Joe Massaglia, Jr. should not be permitted to profit from his own wrong at the expense of the other creditors of Debtor and the sum of $50,000 should be returned to him by Debtor, only after all other secured and unsecured creditors of Debtor have been paid in full.

## XI

Any Conclusions of Law contained in the Findings of Fact are deemed incorporated herein by reference.

## ORDER

By reason of the foregoing Decision, Findings of Fact and Conclusions of Law, it is hereby ordered that Judgment be entered accordingly.